# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**Whatever it Takes**
**Transmission and Parts, Inc.**

        **Plaintiff,**

  v.

**Capital Core, Inc., et al.**

        **Defendants.**

**Case No. 2:10–cv–72**

**Judge Michael H. Watson**
**Magistrate Judge Mark R. Abel**

## <u>OPINION AND ORDER</u>

Whatever it Takes Transmission and Parts, Inc. ("WIT" or "Plaintiff") sues Capital Core, Inc., Capital Core Dayton, LLC, Capital Core Pittsburgh, LLC, Jay Shingala (collectively "Capital Core Defendants") and JK Digital Publishing, LLC, doing business as Greyden Press ("Greyden"), seeking damages for an alleged copyright infringement, unfair trade practices, unfair competition, and unjust enrichment in connection with the copying of WIT's catalog of transmission parts. Capital Core Defendants counterclaim for declaratory judgment on several of the issues and damages suffered due to what they term a frivolous law suit. Plaintiff and Capital Core Defendants move for summary judgment, ECF Nos. 177 & 179. Greyden moves to dismiss the claims against it, ECF No. 166. For the following

reasons, the Court grants in part and denies in part both sides' motions and finds Greyden's motion to dismiss moot.

## I. FACTS

In 2000, Kenny Hester founded WIT, a Kentucky corporation, to sell automotive transmissions and transmission parts throughout the United States.

Defendant Capital Core ("Capital Core") is an Ohio corporation which also sells transmission parts from its store in Columbus. Defendant Jay Shingala ("Shingala") is President and the largest shareholder of Capital Core, Inc. Shingala is also an owner of and controls Defendants Capital Core Dayton, LLC, Capital Core Pittsburgh, LLC, and Capital Investment Group, LLC (the entity which owns the Capital Core buildings). Defendant Greyden is an Ohio limited liability company that once offered printing services in Columbus, Ohio but is now out of business.

Between 2000 and 2003, WIT began creating a transmission parts catalog. Chris Combs ("Combs"), a WIT employee, took photographs of the parts for inclusion in the catalog. Combs testified that when he took the photographs he would position the parts for consistency and set up additional lights to take the best photograph of the part. Combs Dep. 32–33, ECF No. 75. Combs avers that he constructed the photo booth; used a tripod to change the camera's height, angle, and distance from the parts; set up movable lights and adjusted the flash to eliminate shadows or glare; and determined how to position the part for the photograph. Combs Decl. 2–4, ECF No. 177-3.

Combs stated that he would turn the photographs over to Mike Hester, a brother of WIT founder Kenny Hester. Combs testified that Mike Hester never helped him take photos and that when he took photographs he was on his own. Combs Dep. 18, 20, ECF No. 75. Combs took the photographs whenever he had free time, sometimes in the evenings and on the weekends, and was paid per transmission. *Id.* at 19–20. Other WIT employees assisted in preparing the parts to be photographed. This included cleaning and sometimes painting or polishing the parts. *Id.* at 15.

Mike Hester testified that he arranged for Chris Combs to take the photographs.[1] M. Hester Dep. 22, ECF No. 81. When asked who made decisions about lighting and camera settings, Mike Hester responded that he, Combs, and Dalyn Hester, another Hester brother, decided which light settings and camera angles should be used through trial and error. *Id.* at 24. He stated they were looking for clarity, how the photos looked, and the angle they wanted. *Id.* Mike Hester testified that Dalyn Hester's role was to help with the layout of the photographs to make sure the photos were in the correct place. *Id.* at 27.

After the photos were taken, Missy Allen ("Allen") would edit them and organize them into transmission layouts. Allen Dep. 6, 20–21, ECF No. 78. Allen would crop the photographs, delete the backgrounds, change the photo to

---

[1] At some point in the last few years, Mike Hester took over taking the photographs. M. Hester Dep. 31, ECF No. 81. Mike Hester stated that Combs may not have worked on the photographs in the 2009 copyright registration but that he was not sure. *Id.* at 62. WIT does not argue that Mike Hester took the photographs at issue in this litigation.

grayscale, and change the resolution of the image to 300 (which made a 4 by 6 inch photo between half an inch and an inch). *Id.* at 20. Allen would then take the images, place them on a catalog layout, and add the part numbers, directional lines, and any other text or information that needed to be added. *Id.* at 21. Allen would send a copy to Mike Hester who, along with Dalyn Hester, would mark any changes that needed to be made. *Id.* Allen would make the changes and send versions to Mike Hester until he was satisfied with the final product. *Id.*

In addition, Allen compiled the images that were sent to the Copyright Office. She took a sample of all the images she had worked on, placed them on one document, and put the part numbers underneath. *Id.* at 48.

In 2003, WIT obtained a copyright certificate for the collection of photographs titled "Transmission Parts: 2003", No. Vau00601724. 2003 Certificate of Registration, Pl. Mot. Summ J. Ex. A-8 PAGEID# 9052–53, ECF No. 177-1. "Transmission Parts: 2003" covered 325 photographs and 90 transmission layouts. M. Hester Decl. ¶ 25, ECF No. 177-1. In 2009, WIT received a copyright certificate for "Transmission Parts: 2009", No. Vau1-004-350, which covers 84 photographs and 21 additional transmission layouts. 2009 Certificate of Registration, Pl. Mot. Summ J. Ex. A-12 PAGEID# 9064, ECF No. 177-2; M. Hester Decl. ¶ 33, ECF No. 177-1.

In 2004, WIT published its first catalog titled "Automatic Transmission Parts 2004", which included all of the 2003 registered photographs. M. Hester

Decl. ¶ 27, ECF No. 177-1. At the same time, WIT printed generic paper catalogs. Customers could buy the generic catalogs and add their own covers. *Id.* ¶ 42. WIT continually updated the catalog resulting in Automatic Transmission Parts 2005, 2007–2008, 2009–2010, and 2011–2012. *Id.* ¶ 31. Beginning with the 2007–2008 version, WIT began offering WIT brand and generic version catalogs electronically on disc. *Id.* ¶ 45. In addition to selling catalogs, WIT licensed its layouts for between $200–$350 to other transmission part sellers who wanted to use the photographs to make their own catalogs, flyers, or other advertising. *Id.* ¶ 41.

WIT and Capital Core Defendants agree that in April 2007, Shingala inquired about WIT's catalog. M. Hester Dep. 8–9, ECF No. 81. Mike Hester informed Shingala of the options for purchasing catalogs and licensing layouts. Mike Hester testified that he never heard from Shingala about the catalogs again. *Id.* at 14.

Shingala states that he contacted WIT to inquire about having a transmission parts catalog made and that Mike Hester sent him three generic discs. Shingala, however, testified that when he learned his customers preferred print copies of catalogs, he called Mike Hester again. Shingala Dep. 139, ECF No. 83. According to Shingala, Mike Hester told Shingala that due to cost concerns Shingala could print copies at his own cost and recommended a printer. *Id.* at 141–42.

In May 2007, Shingala took the generic WIT catalog disc to Greyden for printing. Shingala Dep. 161–63, ECF No. 83. Shingala gave Greyden WIT's disc and created a cover, line card (the catalog's inside leaf), and binding for the back of the catalog. *Id.* at 131, 163. In June 2007, Greyden provided Shingala with a sample catalog to proof. *Id.* at 178. On September 24, 2007, Shingala ordered 350 copies of the catalog. *Id.* at 186. On November 1, 2007, Greyden delivered the catalogs, and Capital Core paid Greyden $9,621.40. Shingala Dep. Ex. 34, ECF No. 83-20. Capital Core, Inc. distributed the catalog to at least 180 customers. J. Shingala Dep. 207, ECF 83.

On March 20, 2009, two of WIT's customers in Dayton, Ohio gave WIT copies of pages from Capital Core's 2007 catalog. M. Hester Decl. ¶ 48, ECF No. 177-1. Kenny Hester attempted to communicate directly with Shingala, but Shingala did not answer his calls or pick up a registered letter. WIT Dep. 15, ECF No. 80.

On May 13, 2009, Shingala called WIT to order parts and request a WIT brand catalog on disc. WIT filled the order that same day.[2]

---

[2] The parties dispute who at WIT filled the order. Brian Hester, a WIT salesman and son of Kenny Hester, stated in a sworn declaration that he took the call and filled the order. Brian Hester avers he had no knowledge of the dispute between Capital Core and WIT and did not know that Capital Core had printed the contents of WIT's 2007 generic catalog disc. B. Hester Decl. Ex. G 2-3, ECF 177-8. Shingala testified that he spoke with Mike Hester. Second Shingala Dep. 340–41, ECF No. 151.

On June 12, 2009, WIT's attorney sent Shingala a cease and desist letter. J. Shingala Dep. 205, ECF No. 83. WIT sent another cease and desist letter on August 7, 2009. *Id.*

On August 12, 2009, Shingala copied the WIT branded catalog disc to a hard drive and modified the catalog by, among other things, removing the copyright notices in the footer. Second Shingala Dep. 372, ECF No. 151. Shingala states that he printed eight copies of this modified catalog and distributed them to some Pittsburgh area customers. Sealed Portion of Second Shingala Dep. 484, ECF No. 178.

## II. STANDARD OF REVIEW

The standard governing summary judgment is set forth in Federal Rule of Civil Procedure 56(a), which provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Court must grant summary judgment if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also Van Gorder v. Grand Trunk Western R.R., Inc.,* 509 F.3d 265 (6th Cir. 2007).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing there is a genuine dispute of material fact for trial, and the

Court must refrain from making credibility determinations or weighing the evidence. *Matsushita Elec. Indus. Co.*, 475 U.S. 574, 587 (1986); *Pittman v. Cuyahoga Cnty. Dept. of Children and Family Serv.*, 640 F.3d 716, 723 (6th Cir. 2011). The Court disregards all evidence favorable to the moving party that the jury would not be required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009).

Thus, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pittman*, 640 F.3d at 723 (quoting *Anderson*, 477 U.S. at 251–52).

### III. DISCUSSION

### A. Copyright Infringement

In WIT's motion for summary judgment, it seeks to demonstrate that it has presented enough evidence to prove the photographs were protected by copyright, and Capital Core Defendants illegally copied them. Capital Core argues WIT has not created a genuine dispute of material fact as to whether the material copied was validly protected by a copyright.

### 1. Nature of the Copyright Claim: Catalog v. Photographs

Capital Core Defendants first argue WIT cannot bring an infringement suit because WIT's Third Amended Complaint is based exclusively on Capital Core's infringement of WIT's catalog, and WIT does not hold a copyright in its catalog. WIT responds that it is seeking damages for the infringement of its copyrighted photographs.

The Third Amended Complaint is ambiguous as to whether WIT alleges infringement of its catalog, photographs, or both. The first portion seems to emphasize the catalog. Third Am. Compl. ¶¶ 1, 2, ECF No. 156. Other portions of the complaint suggest WIT is alleging both the catalog and the photographs in the catalog were protected by a copyright. The complaint specifically alleges that "Plaintiff WIT received from the Register of Copyrights a Certificate of Registration for its Catalog, including all its photographs, Transmission Parts: 2003" and "Transmission Parts: 2009." *Id.* ¶ 41 & 43. In fact, Transmission Parts: 2003 and Transmission Parts: 2009 are copyrights for unpublished collections of photographs. Taking the complaint as a whole, the Court will proceed under the understanding WIT seeks damages for the infringement of its catalog and of its copyrighted photographs.

Capital Core Defendants are, however, correct that because WIT does not hold a copyright for its catalog, it may not proceed with a suit based on infringement of the catalog. Under 17 U.S.C. § 411, "no civil action for infringement of the copyright in any United States work shall be instituted until

preregistration or registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a). It is undisputed that WIT does not have a copyright registration for its catalog. Accordingly, Defendants are entitled to summary judgment on the claims concerning infringement of the catalog itself.

Capital Core Defendants also argue that WIT cannot recover for infringement of the registered photographs because Capital Core Defendants copied the catalog or the transmission layouts, not the photographs themselves. Capital Core Defendants argue the catalogs and/or transmission layouts are either derivative works or new works, and infringement of either one is not an infringement of the underlying work. WIT responds that neither the catalogs nor the transmission layouts are derivatives or new works because there are no added elements that make the catalog or the transmission layouts an original work.

Whether or not the catalogs or transmission layouts are derivative or new works, Plaintiff may recover for the infringement of the underlying registered photographs. "Given that a derivative work by definition consists of matter that would be infringing if it had been derived from pre-existing work without the copyright proprietor's consent, it follows analytically that the owner of a registered underlying work, in that capacity alone, should be able to maintain such a suit." 2 Nimmer on Copyright § 7.16[B][5][b] (2012).

Capital Core Defendants rely on *Murray Hill Publications, Inc. v. ABC Communications, Inc.,* 264 F.3d 622, 630 (6th Cir. 2001), for the proposition that a derivative work must be registered with the Copyright Office before a plaintiff can recover for infringement of the registered underlying work.[3] The Sixth Circuit's treatment of that issue in *Murray Hill* is, however, ambiguous. The plaintiff in *Murray Hill*, Bobby Laurel ("Laurel"), composed and copyrighted the song *Jeanette* and then used the tune from *Jeanette* to create *J.P.'s Theme* ("the Song") for his friend J.P. McCarthy, a Detroit radio personality. The defendant used *J.P.'s Theme* in a tribute show that was created and sold after McCarthy's death. In describing the district court's holding in relation to its holding, the *Murray Hill* panel stated the following:

> The district court held that it lacked jurisdiction over Laurel's copyright infringement claim relating to the Song because plaintiffs had never registered the Song with the Copyright Office (the original work, *Jeanette,* was registered, but the derivative work, *J.P.'s Theme,* was not.) The court further held that although it had jurisdiction over the claim that WJR's use of the Song infringed the underlying work, this claim was waived because Laurel gave the Song to McCarthy, thereby granting a license at least by implication. Finally, the court held that the Foundation, the organization that without question actually profited from the sales of the Recording containing the Song, was not a party to the lawsuit and WJR was not liable for the Foundation's conduct. Because we agree that plaintiffs cannot bring an action for infringement of their copyright on the Song because it was not registered with the United States Copyright Office, we need not address the remaining issues relating to this infringement claim discussed by the district court—whether WJR had

---

[3] *Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc.* was abrogated on other grounds by *Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154 (2010) (holding registration is a precondition to suit, not a jurisdictional requirement).

> a license to use to the Song and whether the Foundation should have been named as a party to the lawsuit.

*Murray Hill*, 264 F.3d at 260. That quote can be read to hold that because no claim for the unregistered derivative work can proceed, no claim of infringement can proceed on the registered underlying work.

That interpretation does not, however, comport with Nimmer on Copyright, the leading scholarly authority on copyright law. *See* 2 Nimmer on Copyright § 7.16[B][5][b] (2012). In addition, decisions in other circuits that have addressed this issue directly side with Nimmer. *See Dalton-Ross Homes, Inc. v. Williams*, CV–06–1301, 2007 WL 2461892, at *3 (D. Az. Aug. 29, 2007) (suit based on copying unregistered architectural floor plans could have proceeded if plaintiff had shown the alleged infringement copied protectable elements of registered underlying floor plan); *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 275 F. Supp. 2d 543, 555–56 (D.N.J. 2003) (distinguishing *Murray Hill* to allow suit concerning unregistered derivative movie trailers that borrowed exclusively from registered movie to proceed).

The Court finds that a mere implication by omission in *Murray Hill* is not enough to overcome the logic Nimmer articulates and other courts have recognized. The Court will therefore allow WIT to proceed under the theory that by copying the unregistered catalog, Capital Core Defendants infringed the registered underlying photographs.

Finally, the fact that the photographs were arranged into transmission layouts does not prevent a suit based on the registered photographs. At the hearing, Defendants argued that the copyright registrations were awarded for the way in which the photographs were laid out on the page instead of the originality of the photographs themselves. However, the registration certificates described the work as photographs and do not mention the manner in which the photographs were laid out on the page. Pl. Mot. Summ. Judg. Exs. A-8, A-12, ECF Nos. 177-1, 177-2. In addition, the Defendants' copyright expert testified that even when multiple photographs are on a single page when submitted to the Copyright Office, copying only one of the photographs could be a copyright infringement. Phillips Dep. 56, ECF No. 70-2. Finally, there is a real question whether the organization of parts on a page can ever be original enough to be copyrighted. *See ATC Distrib. Grp. v. WIT*, 402 F.3d 700, 712–13 (6th Cir. 2005). Therefore, the Court holds the copyright registration protected the photographs themselves, and the transmission layouts in WIT's catalog contained the copyrighted work.[4] The logic of Nimmer applies to the relationship between the transmission layouts and the registered photographs. Regardless of

---

[4] Defendant also argues that the individual photographs contained in the copyright submission were different, and sometimes absent, from the catalogs. The fact that the catalog contains more photographs than the copyright registration does not change the fact that the catalog contained copyrighted photographs. In addition, that some of the images in the catalog are different than the copyrighted photographs does not change that some copyrighted photographs appear in the catalog. *Compare, e.g.,* Pl. Mot. Summ. Jud. Ex. A-7 PAGE ID # 9036, ECF No. 177-1 *with* Def. Mot. Summ. Jud. Ex. C-2 PAGE ID # 9249, ECF No. 179-2 and Def. Mot. Summ. Jud. Ex. C-5 PAGE ID # 9387, ECF No. 179-5 (showing photograph in copyright submission same as catalog).

whether the transmission layouts were new works, Plaintiff can pursue a claim for an infringement of the underlying work.

## 2. Elements of a Copyright Claim

Having thus defined the claim and the registrations at issue, the Court turns to the elements of the copyright claim. To establish copyright infringement, a plaintiff must show (1) the existence of a copyrighted work and (2) that the defendant copied constituent elements of the work that are copyrightable. *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1961). In addition, to have standing to sue, the plaintiff must have owned the copyright at the time of alleged infringement. 17 U.S.C. § 501(b). Defendants argue the photographs are not original and, therefore, there is no copyrightable work; Plaintiff does not own the copyright to the photographs because it was not the author; Defendants did not copy any copyrightable elements of the photographs; and Plaintiff granted Defendants a non-exclusive license to use the photographs.

### a. Originality

A work is copyrightable if it is an "original work of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). The originality requirement is constitutionally mandated. *Feist Publ'ns., Inc.*, 499 U.S. at 347 (citing U.S. Const. art. I, § 8, cl. 8).

Originality contains two considerations: (1) the author actually created the work rather than copying an existing work; and (2) the work is sufficiently creative to merit protection under the Copyright Act. *Id.* at 345 (citing 1 Nimmer on

Copyright §§ 2.01(A),(B)(2012)). Certificates of registration obtained before or within five years of the first publication of the work create a rebuttable presumption of a valid copyright, and alleged infringers bear the burden of rebutting the presumption. 17 U.S.C. § 410(c); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004).

Defendants argue the photographs are not sufficiently creative because the decisions about the photographs were made through trial and error, the photographer's intent was to make an exact copy of each transmission part, and Allen's changes negated any creativity in taking the photographs. Plaintiffs reply the photographers made choices about lighting and angles so that the photo would meet their needs, which is the minimum level of creativity required.

"[T]he requisite level of creativity is extremely low, even the slightest amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Feist Pub'lns, Inc.*, 499 U.S. at 345

An exact reproduction of the subject, however, is not protectable. *ATC Distrib. Grp. v. Whatever it Takes Transmission & Parts*, 402 F.3d 700, 712 (6th Cir. 2005).[5] In *ATC Distribution Group*, the Sixth Circuit considered whether illustrations which were traced from photographs of transmission parts involved a

---

[5] Capital Core Defendants make much of the fact that in *ATC Distribution Group* , WIT succeeded in defeating ATC's copyright in its catalog. The Court gives the Sixth Circuit opinion in that case the precedential weight it is due as a decision of this Court's reviewing court, but no more or less because it happens to involve the plaintiff in this case.

"substantial variation" and were therefore original. The Sixth Circuit held the illustrations in ATC's catalog could not be protected by a copyright because "[t]he illustrations were intended to be as accurate as possible in reproducing the parts shown in the photographs on which they were based, a form of slavish copying that is the antithesis of originality." *Id.* The panel also cited *J. Thomas Distribs. v. Greenline Distribs., Inc.*, 100 F.3d 956 (table), 1996 WL 636138, at *1 (Oct. 1, 1996), which held a drawing of a spindle bearing did not meet the minimum level of originality because it was "drawn with the express intention of duplicating on paper the appearance of an actual spindle bearing." *Id.* at *2.

The originality of photographs have a unique history in copyright law. *See SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 306–10 (S.D.N.Y. 2000). Historically, some considered all photographs mere reproductions undeserving of copyright. *Id.* The understanding of photographs has now changed. The current prevailing wisdom is that "most photographs contain at least some originality in their rendition . . . except perhaps a very limited class of photographs that can be characterized as 'slavish copies' of an underlying work." *Schrock v. Learning Curve Int'l., Inc.*, 586 F.3d 513, 519 (7th Cir. 2009). "Elements of originality in a photograph may include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression and almost any other variant involved." *Decker Inc. v. G & N Equip. Co.,* 438 F. Supp. 2d 734, 742 (E.D. Mich. 2006) (quoting *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992)).

Defendants have not rebutted the presumption of originality that Plaintiff's registrations create. The fact that Combs and Mike Hester used trial and error in their decision making process, rather than academic theory or other training, does not minimize the fact that they made decisions about positioning, lighting, and angles in order to achieve their desired product. *See SHL Imaging, Inc.*, 117 F. Supp. 2d at 303–04, 310 (describing similar process in photographing mirrored frames).

There is some evidence suggesting the photographs were intended to be exact copies of the transmission parts. Mike Hester testified as follows:

> Q: Why was the background taken out:
> A: So it would look the same on a piece of paper so you'd never seen [sic] nothing except the actual part itself.
> Q: So I understand, so it would look the same as you would see the transmission part in real life?
> A: Basically on a piece of paper. White paper.

M. Hester Dep. 23–24, ECF No. 81. In response to the question "Is it fair to say that those photographs are designed to be accurate representations of transmission parts?", Kenny Hester testified "That's our intent. Yes." K. Hester Dep. 83, ECF No. 79. This testimony, which is simply in response to the pointed questioning of opposing counsel, does not control the legal analysis of whether the work involved creativity.

Rather, the evidence demonstrates that Mike Hester, Combs, and Allen employed the requisite creativity in creating the copyrighted photographs. Combs chose the position of the parts, lighting, and camera heights and angles

in consultation with Mike and Dalyn Hester. Combs Dep. 32–33, ECF No. 75; M. Hester Dep. 24, ECF No. 81. Even though some of these choices were made to enhance the recognizability of the parts, different choices could have been made to reach that same goal. Allen also had to decide how to crop the photographs and delete the backgrounds. Allen Dep. 6, 20, ECF No. 78. She chose to make the photographs grayscale and change the resolution of each photo. *Id.* Although she made similar changes to each photograph, there was still a creative element to deciding in what way she would make the parts look consistent. Contrary to Defendants' argument, Allen's changes enhanced the creative aspects of the photographs instead of negating them.

The *ATC Distribution Group* and *J. Thomas Distributors* decisions are distinguishable from the case *sub judice* by the creativity Combs and Allen used in deciding how to depict the transmission parts. In *ATC Distribution Group*, the person tracing the photograph had no opportunity to engage creativity in making the new image of the part because the photograph already displayed the part in a certain position, with certain shadows and lights, and at a certain angle and height. In this case, Combs and Allen made all of those decisions anew. *See also Decker Inc.*, 438 F. Supp. 2d at 742 (distinguishing *ATC Distribution Group* because it did not involve copyrightability of photographs). Although the unpublished decision of *J. Thomas Distributors* may imply that any depiction which seeks to exactly replicate a product cannot be copyrighted, the decision specifically notes that the drawing of the spindle bearing "involved absolutely no

creative spark whatsoever." 100 F.3d 956 (table), 1996 WL 636138, at *1 (Oct. 1, 1996). In contrast, here, Combs, and Allen met the low hurdle of creativity applied in copyright cases.[6]

Nor do cases concerning the copyrightabiliy of "useful articles" affect the analysis. The useful article doctrine applies when there is an artistic embellishment to a utilitarian object, such as jewelry, clothing items, fabrics, dolls, etc. 1 Nimmer on Copyright § 2.08[B][3] (2012). The cases Defendants cite deal exclusively with these types of objects which have their own use, in contrast to photographs that are only used to market products. See, e.g., Fabrica Inc. v. El Dorado Corp., 697 F.2d 890, 893 (9th Cir. 1983) (holding carpet sample book was useful article and not copyrightable).

Accordingly, Defendants have failed to rebut the presumption of originality established by Plaintiff's registration, and the Court grants Plaintiff summary judgment on the issue of whether the photographs are original.

### b. Ownership

Generally, the author of a copyrighted work owns it. 17 U.S.C. § 201(a). When a work is made for hire, the employer or other person for whom the work was prepared owns all of the rights comprised in the copyright, unless the parties

---

[6] Plaintiff argues the Court should not rely on *J. Thomas Distributors* because it has not been cited in any other opinion and was criticized by Nimmer. Nimmer critiques *ATC Distribution Group*'s reliance on *J. Thomas Distributors* in its analysis of whether the arrangement of the illustrations in the ATC catalog was protectable. Nimmer states that *J. Thomas Distributors* "imports nothing about the general copyrightability of cut away drawings" and that a cut away drawing is copyrightable "to the same extent photographs are copyrightable." 1 Nimmer on Copyright § 2.08[F][1] (2012). Therefore, that critique does not apply directly to this Court's analysis.

have expressly agreed otherwise in a written instrument signed by them. 17 U.S.C. § 201(b).

A work made for hire is, "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101.[7] This is a two prong analysis, which asks first if the hired person was an employee and then whether the work was within the scope of his employment. Courts apply the common law of agency to determine whether a hired party is an employee and whether the work of an employee was within their scope of employment for purposes of copyright authorship. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739–40 (1989).

The work was performed within the scope of employment if:

(1) The work was the type for which the employee was hired to perform;
(2) The creation of the work occurred substantially within the authorized time and space limits of his job; and
(3) The work was actuated at[,] least in part, by a purpose to serve his employer's interests.

*Cannon Grp., Inc. v. Better Bags, Inc.*, 250 F. Supp. 2d. 893, 900 (S.D. Ohio 2003) (relying on Restatement (Second) of Agency § 228 (1958)).[8]

---

[7] "A work specially ordered or commissioned for use as a contribution to a collective work . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire" is also a work made for hire under 17 U.S.C. § 101. As no one argues the photographs were a commissioned work, only the first part of the definition applies.

[8] From a review of case law, it does not appear that federal copyright law has incorporated the Restatement (Third) of Agency, published in 2006. The Court notes, however, that it differs substantially from the 1958 version. Section 7.07, Employee Acting Within Scope of Employment states, in part, "an employee acts within the scope

The test is conjunctive—all three prongs must be satisfied in order for the work to be within the scope of employment. *Quinn v. City of Detroit*, 988 F. Supp. 1044, 1049 (E.D. Mich. 1997).

Defendants argue Combs and Allen, rather than WIT, are the owners of the copyright and the misrepresentation of WIT as the author on the copyright registrations invalidates those registrations. Plaintiff argues the photographs were work made for hire because the works were prepared within the scope of Combs' and Allen's employment with WIT, or, in the event that Allen was not an employee, Allen's additions were insubstantial; both Combs and Allen have now expressly transferred any copyrights that they might have held to WIT; and Defendants do not have standing to challenge the validity of WIT's ownership.

The Court notes that it is skeptical of Capital Core Defendants' challenge to WIT's authorship because all potential authors agree that WIT is the author. Combs Decl. ¶ 24, ECF No. 177-3; Allen Decl. ¶ 12, ECF No. 177-3. *See Law Enforcement Training and Research Assocs. v. City and Cty. of San Francisco*, Nos. 90-15482, 90-15638, 1991 WL 172416, at *1 (9th Cir. Sept. 4, 1991) ("The district court should give careful consideration where, as here, the work for hire doctrine is invoked solely as a third party defense and the asserted copyright holder has knowingly acquiesced to the plaintiff's commercial use of the work."). However, courts generally have allowed such a challenge to proceed. *See, e.g.*,

of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control." Restatement (Third) of Agency § 7.07(2) (2006).

2 Nimmer § 5.03[A](2012); *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1490 (11th Cir. 1990); *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1097 (N.D. Cal. 2002) (distinguishing challenges to authorship from third party challenge to assignment).[9] Therefore, the Court will consider the merits of the challenge.

Combs was an employee of WIT. Defendants do not argue otherwise. At the time he took the photographs, he worked in the hard parts production department, processing and remanufacturing parts for resale and maintenance. Combs Dep. 6–7, 9, ECF No. 75.

Combs also took the photographs within the scope of his employment with WIT. First, photographing the transmission parts was at least incidental to the type of work Combs was hired to perform. Combs was hired to work in the hard parts production department, which remanufactures transmission parts. Combs Dep. 16, ECF No. 75. Combs testified that his job is to do "whatever needs to be done" and stated he viewed photography as part of his job responsibilities. *Id.* at 8; Combs Decl. 1, ECF No. 177-3. Section 229 of the Second Restatement states "to be within the scope of employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized."

---

[9] *Tacori Enterprises v. Rego Manufacturing*, which Plaintiff cites, is one such case which forbids a third party challenge to an assignment. No. 1:05cv2241, 2008 WL 4426343 (S.D. Ohio 2008). Here, however, Defendants are not challenging the validity of an agreement under 17 U.S.C. § 204(a). Instead, Defendants are arguing there was no agreement and WIT never owned the work. Defendants are challenging an element of Plaintiff's copyright claim—ownership—which they have the right to do.

Comment b to Section 229 of the Restatement states that acts incidental to authorized acts may be within the scope of employment and continues:

> An act may be incidental to an authorized act, although considered separately it is an entirely different kind of an act. To be incidental, however, it must be one which is subordinate to or pertinent to an act which the servant is employed to perform. It must be within the ultimate objective of the principal and an act which it is not unlikely that such a servant might do.

Restatement (Second) of Agency § 229 cmt. b (1958). Photography, although a completely different kind of act than preparing transmission parts for sale, was still within WIT's ultimate objective (i.e. selling transmission parts) and not unlike something an employee in the production department of a transmission sales business might do. Therefore, photographing transmission parts for advertising purposes was incidental to the purpose of Combs' employment and within the scope of his employment with WIT.

This conclusion is supported by the fact that many other WIT employees worked with Combs to make the photographs possible. Mike Hester testified that he requested that Combs take the photographs and that he and Dalyn Hester helped make creative decisions. M. Hester Dep. 22, 24, ECF No. 81. Other WIT employees in the production department would prepare the parts to be photographed. Combs Dep. 15, ECF No. 75.

Combs did testify that he was paid per transmission that he photographed. Combs Dep. 19–20, ECF No. 75.[10] However, such payment arrangement need not control the analysis.

The photography was incidental to his work in the production department, Combs' supervisor told Combs to take the photographs, he was assisted by other employees in the production department, and his work was accepted or rejected by Mike Hester. These circumstances show that photography to promote the sale of transmission parts was the type of work Combs was hired to perform. *See Miller v. CP Chemicals, Inc.*, 808 F. Supp. 1238, 1242–44 (D.S.C. 1992) (applying Restatement (Second) of Agency §§ 228 & 229 to find creation of computer program to assist with quality control job was within scope of employment).

In addition, Combs created the photographs substantially within the authorized time and space limits of his job. Combs testified he took the photographs during his free time—during normal work, after work, and

---

[10] In a declaration attached to Plaintiff's motion for summary judgment, Combs states he viewed photography as part of his job responsibilities, and WIT paid him for his photography work through normal payroll without any submission of additional time cards or other records. Combs Decl. ¶ 3, ECF No. 177-3. Defendants argue Comb's declaration should be disregarded because it conflicts with his prior sworn deposition on what his job duties were. A party may not create a genuine dispute of material fact by contradicting deposition testimony with an affidavit. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006). It is not clear that this declaration contradicts his deposition: it says only that he did not submit any extra paperwork, not that he was not paid per transmission, and Combs was never asked whether he viewed photography as part of his job responsibilities. The Court will, however, disregard Combs' assertion that he was paid through normal payroll to the extent it conflicts, if at all, with his deposition testimony that he was paid per transmission that he photographed.

sometimes on the weekend—but always on site at the WIT store and with the camera and materials provided by WIT. *Id.* at 13,18; Combs Decl. ¶ 8, ECF No. 177-3.

Finally, the photographs were meant to serve WIT's purpose. Mike Hester requested that Combs take these photographs as part of WIT's larger effort to create their own catalog. Accordingly, all three factors are met, and the Court finds as a matter of law that Combs took the photographs of transmission parts within the scope of his employment.[11] WIT is at least co-author of the photographs through the work for hire doctrine.

The Court need not consider the authorship status of Allen. "[A]uthors of a joint work are coowners of copyright in the work." 17 U.S.C. § 201(a). Even assuming Allen's contributions made the photographs joint works, WIT and Allen would be co-owners of the photographs.[12] Co-authors have the right to pursue infringement actions on their own and failure to include a co-author does not

---

[11] Applying Restatement (Third) of Agency § 7.07 would render the same result. The photographs were assigned by Mike Hester and, therefore, squarely meet the definition of within the scope of employment. In addition, the new definition of within the scope eliminates the requirement that the work be done within the time and space limits of employment in recognition that many jobs are not confined by those limits. *See* Restatement (Third) of Agency § 7.07 cmt. b (2006).

[12] The Court finds the assumption that Allen is a co-author far from certain. *See, e.g., Tang v. Putruss*, 521 F. Supp. 2d 600, 605–06 (E.D. Mich. 2007) (to be joint work, contributors must have intended to be joint authors and each contributor's work must be independently copyrightable; holding photography assistant not joint author). The Court, however, declines to undertake this analysis because the issue is not fully briefed using the joint authorship test. Although Plaintiff attempts to minimize Allen's contributions, it does not cite to case law which would enable the Court to conduct a thorough analysis.

invalidate a copyright registration. 2 Nimmer on Copyright § 7.20[B](2012).

Nimmer specifically states, "Given that even the wrong name of the author may

be excused, a fortiori, mention in a registration certificate of only one of two co-

authors does not affect the validity of the registration." *Id.*[13]   Accordingly,

because WIT was at least a co-author, WIT's registration was valid and Court

grants WIT's motion for summary judgment on the issue of ownership.

### c. Copied and Distributed Copyrighted Work

A copyright owner has the exclusive right to reproduce the copyrighted

work; prepare derivative works based upon the copyrighted work; and distribute

copies of the copyrighted work to the public. *See* 17 U.S.C. § 106.

Plaintiff argues that by printing the contents of WIT's 2007 Generic Disc

Capital Core Defendants copied all the photographs that WIT registered in 2003

---

[13] Defendant cites *Hi-Tech Video Productions, Inc. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093, 1099 (6th Cir. 1995) for the proposition that a work made in part by an independent contractor is not made for hire and a registration claiming the work is made for hire is invalid. Plaintiff argues *Hi-Tech* is distinguishable because it does not consider the ramifications of joint ownership.

Plaintiff is correct. Although Hi-Tech held that the registration at issue was invalid because it failed to identify the independent contractors who contributed to the project as authors, it did not consider whether the work was in fact a joint work between the company (through the work for hire of its owner) and the independent contractors. Here, the Court has already held that WIT was an author through the work for hire doctrine, therefore the registration is not invalid. *See* 2 Nimmer on Copyright § 7.20[B](2012).

Although this Court merely distinguishes *Hi-Tech*, it also notes Nimmer criticized *Hi-Tech* on this point. Nimmer states a defendant may challenge the validity of a plaintiff's copyright ownership by framing appropriate allegations under the work for hire doctrine, but "[i]t goes too far, however, to rule the copyright invalid based on its registration as a work for hire, as was held in [*Hi-Tech* ]. That holding was particularly inappropriate to the extent that one of the several creators of the work at issue qualified as an employee." 1 Nimmer on Copyright § 5.03 [A](2012).

and fifty-two photographs that WIT registered in 2009. In addition, Plaintiff argues, Capital Core Defendants copied all of WIT's copyrighted photographs when Shingala printed copies of the 2009 WIT catalog in 2010. Capital Core Defendants do not deny that Shingala printed the contents of the catalog. In fact, Shingala himself testified to that fact. Shingala Dep. 131, ECF No. 83; Sealed Portion of Second Shingala Dep. 484, ECF No. 178. Instead, Defendants argue because they copied the catalog and/or the transmission layouts, they copied a new or derivative work, not the photographs themselves.

The Court has already addressed Defendants' attempt to distinguish the catalog and/or transmission layouts from the photographs themselves. In Section A.1 of this Order, the Court held the claim based on infringement of the photographs could proceed even though the registered photographs were incorporated into unregistered transmission layouts and catalogs before being copied.

Although the Court held only that the suit could proceed, not that the Defendants had definitely copied protected elements of the photographs, Defendants' arguments have the same faults as before. Defendants continue to argue it was impossible to have copied the photographs because they actually copied the catalog, not that they did not copy the specific elements of the photographs that were original (i.e. the position of the parts, the angle, or the lighting). For example, Defendant points again to the fact the photographs in the registrations are in a different order than in the catalog and do not have line

drawings or arrows showing directions from part to part. This argument, however, goes only to whether the catalog was a new or derivative work. Defendant has not argued that the elements of the photographs as created by Combs and Allen do not appear in the copies Capital Core Defendants made.

Capital Core Defendants infringed on WIT's exclusive rights. The photographs registered in Plaintiff's copyrights are the same photographs that appear in WIT's 2007 and 2009 catalogs, and therefore the same photographs which appeared in the 2007 and 2010 Capital Core catalog since Shingala merely printed WIT's catalog. M. Hester Decl. ¶¶ 24, 35, 59, ECF No. 177-1; Shingala Dep. 161–63, ECF No. 83; Sealed Portion of Second Shingala Dep. 484, ECF No. 178. In addition, Capital Core, Inc., Capital Core Dayton, LLC, and Capital Core Pittsburgh, LLC distributed the Capital Core catalogs. Shingala Dep. 54, ECF No. 83; Sealed Portion of Second Shingala Dep. 484, ECF No. 178 (Shingala distributed the 2010 Capital Core catalog in Pittsburgh on Capital Core Pittsburgh's behalf). Accordingly, the Court grants Plaintiff summary judgment on the issue of whether Defendants copied and distributed Plaintiff's copyrighted work.

### d. Implied License

Capital Core Defendants argue their copying was not illegal because Plaintiff granted them an implied, non-exclusive license to use the photographs. Plaintiff responds that it did not grant any kind of license, even if a license was

granted it was exceeded, and any license granted was terminated through the cease and desist letter.

Grants of non-exclusive writings do not require a written agreement. *See* 17 U.S.C. §§ 101, 204(a). However, implied licenses are found only in narrow circumstances, and the party asserting the license has the burden of showing it existed. *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003).

In *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998), the United States Court of Appeals for the Sixth Circuit held that an implied license was a complete defense to an infringement claim. However, the test for an implied license adopted by the Sixth Circuit in *Johnson* only contemplates situations in which an alleged licensor requests that the alleged licensee create a work. Specifically, the *Johnson* test requires (1) a person (the licensee) request the creation of a work; (2) the creator (the licensor) make that particular work and deliver it to the licensee who requested it; and (3) the licensor intended that the licensee copy and distribute its work. *Jedson Eng'g, Inc. v. Spirit Constr. Serv., Inc.*, 720 F. Supp. 2d 904, 918 (S.D. Ohio 2010). Other cases cited by Defendants look to additional factors to determine whether the licensor intended that the licensee copy and distribute its work:

(1) Whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship;

(2) Whether the creator utilized written contracts . . . providing that copyrighted materials could only be used with the creator's future involvement or express permission; and

(3) Whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

*See, e.g., John G. Danielson, Inc.*,322 F.3d at 40. However, these cases all consider claims by copyright authors who the alleged licensees asked to create the original work. Defendants requested copies of WIT's catalog which was already in existence.[14] Therefore, the entire concept of implied license is ill fit for this situation.

However, even if the Court were to adopt the *Johnson* test under these circumstances, Defendants have not met their burden of establishing WIT granted an implied license to print catalogs. Defendants do not point to any aspect of the interactions between the WIT employees and Shingala from which a reasonable finder of fact could infer WIT intended for Shingala to copy and

---

[14] Defendants misleadingly argue "Capital Core, through Shingala, approached Mike Hester of WIT in April 2007, about the creation of a transmission parts catalog, with WIT part numbers and descriptions, that could be used by Capital Core and distributed to its customers." Def. Mot. Summ. J. 27, ECF No. 179. By Shingala's own testimony he asked Mike Hester about getting a catalog on CD with Capital Core's logo, text and a part numbering scheme and Mike Hester provided a CD that WIT had already created. Shingala Dep. 137, ECF No. 83. This distinction separates this situation from any of the cases Defendants cite in which the authors created their work in response to a specific request.

distribute the photographs contained in the catalog.[15]  The evidence Defendants

do point to can be divided into two categories: evidence that goes to WIT's

general intent about the catalogs and evidence that does not show intent.

In the first category are Defendants' arguments concerning the Generic

Catalog Agreement, M. Hester Dep. Ex. 3, ECF No. 81-3, and a 2007 customer

letter often sent along with sample catalog discs, M. Hester Dep. Ex. 2, ECF No.

81-2.  Shingala testified that he never saw the Generic Catalog Agreement or the

2007 customer letter.  Shingala Dep. 153–54, ECF No. 83. [16]  Courts that have

---

[15] The Court notes one glaring omission in Defendants' license argument: Shingala's testimony that Mike Hester told Shingala it was too expensive for WIT to print copies of the catalogs and therefore Shingala should print copies using a printing service. Shingala 141–42, ECF No. 83.  This testimony is mentioned only in the introduction section of Defendants' motion for summary judgment. Def. Mot. Summ. J. 1, ECF No. 179.  Although Defendants' response to Plaintiff's motion for summary judgment incorporates Defendants' motion for summary judgment, Defendants' response does not specifically mention this testimony from Shingala even in the fact section.  Def. Resp. 10–11, ECF No. 186. Mike Hester denied ever speaking to Shingala about the catalogs after their first conversation. M. Hester Dep. 14, ECF No. 81. It is not apparent why Defendants declined to argue that Shingala's testimony created a genuine dispute of material fact as to whether WIT impliedly licensed the photographs at issue through Mike Hester's statements, but the Court declines to make this argument for Defendants.

[16] Furthermore, although Defendants argue these documents state catalog customers could copy the discs and give them to their parts customers, the documents do not support that argument. The Generic Catalog Agreement states that a WIT catalog disc will be given to each catalog customer and that this disc can be copied and given to the purchaser's customers. M. Hester Dep. Ex. 3, ECF No. 81-3. The 2007 sample customer letter states "I am sending you our 2007 catalog on CD.  You may use or make copies of it.  We are also offering a Generic Disc with your artwork on it, or with your company name and phone number." M. Hester Dep. Ex. 2, ECF No. 81-2.  Plaintiff argues these statements referenced the WIT brand catalog. Taken together, these documents suggest WIT allowed copying of its WIT brand catalog disc but not of its generic disc.  WIT may have allowed copying and distribution of the WIT branded catalog in order to encourage its name recognition and to encourage orders to WIT, but

held a party granted an implied license looked only to the circumstances surrounding the particular work in dispute. *See, e.g.*, *Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 879–83 (5th Cir. 1997) (considering facts surrounding creation of the jingles in dispute to hold author intended to license jingles at issue); *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957–58 (11th Cir. 2009). Therefore, the Generic Catalog Agreement and 2007 customer letter could not go to WIT's intent to license the catalog to Capital Core Defendants.

The rest of Defendants' evidence does not demonstrate WIT intended for Shingala to make print copies of WIT's catalog. That a WIT employee sent Shingala more catalog discs in 2009 after WIT had discovered the 2007 alleged infringement does not show WIT intended for that disc to be copied.[17] The disc

---

require purchases of generic discs to be through WIT in order to ensure some control and revenue.

[17] The circumstances surrounding the discs WIT sent to Shingala in 2009 are highly contested. WIT provides the declaration of Brian Hester which states Brian Hester spoke with Shingala on May 13, 2009 in which Shingala ordered parts and requested a WIT brand catalog on disc. Pl.'s Mot. Summ J. Ex. 8 ¶ 3, ECF No. 177-8. Brian Hester states he filled the order that same day and at the time he had no knowledge of any dispute between WIT and Capital Core. *Id.* ¶¶ 4–5. Shingala testified that he spoke to Mike Hester in the spring of 2009 and it was Mike who sent him the discs in 2009. Second Shingala Dep. 340–41, ECF No. 151. Mike Hester testified that at some point he talked to Shingala about the new catalog but that Mike Hester referred Shingala to Kenny Hester because he knew there was a dispute and lawyers were involved. M. Hester Dep. 17, ECF No. 83. Mike Hester did not indicate when that call occurred. The May 13, 2009 WIT invoice indicates two automatic CD's were sent at no cost and that the Sales Representative was "Hester" but does not indicate which Hester filled the order or whether the discs were WIT brand or generic. Def. Reply Ex. 2, ECF No. 132-2.

Even assuming Mike Hester sent Shingala the discs, there is no evidence Mike Hester was aware of the dispute at the time he sent the disc. Nor would the fact that he

WIT sent 2009 had copyright notices prominently displayed on its pages and, at the time of Shingala's call to WIT, WIT had already sent Capital Core a cease and desist letter claiming infringement of the 2007 catalog which indicated WIT's desire to protect its work.[18]  In addition, the mere transfer of a physical object does not convey copyrights.  17 U.S.C. § 202.  The fact that WIT gives copies of its catalogs away to its transmission parts customers also does not demonstrate it intended for its competitors to copy its catalogs without compensation.[19]  WIT created catalogs with its name on it in order to make it easier for the customers buying transmission parts from WIT to identify which pieces they needed.  This is a completely separate purpose from selling generic catalogs to competitors. Similarly, that paying catalog customers could put their own cover on the generic catalogs does not show WIT intended to give away the photographs for free. Defendants, therefore, have failed to meet their burden to demonstrate an implied license.

---

was aware of a dispute immediately lead to an inference that Mike Hester intended for Shingala to copy the 2009 disc.

[18] It is undisputed Shingala saw those copyright notices.  He removed those notices from the text of the catalog before printing copies.  Second Shingala Dep. 372, ECF No. 151.

[19] Defendants point to a portion of Mike Hester's testimony in which the reference to customers is slightly ambiguous.  In the midst of asking Mike Hester about customers who purchased generic paper catalogs from WIT and confirming that Mid-America Parts paid $4 per catalog, Defendant's counsel asked "what did your customers pay you per printed catalog in 2008?"  M. Hester Dep. 55, ECF No. 83.  Mike Hester responded that WIT usually just gave catalogs to customers. *Id.*  The Court takes this response to be in reference to WIT's transmission part customers instead of its catalog customers because Mike Hester had just testified $4 was the going rate for generic print catalogs to catalog customers, and this is confirmed by a WIT invoice.  M. Hester Dep. Ex. 5, ECF No. 81-5.

In addition, the evidence presented by Plaintiff supports a finding that no license was granted. When Shingala called Mike Hester in 2007 to inquire about catalogs, Mike Hester explained WIT's disc catalog pricing options. Shingala Dep. 143, ECF No. 83. The discs Mike Hester sent to Shingala demonstrated that they were advertising. The face of the CD read, "Your Logo & Information will be placed here!" M. Hester Decl. ¶ 5, ECF No. 185-1; M. Hester Decl. Opp. Ex. A-1, ECF No. 185-2. On June 12, 2009, two months prior to the second printing of the catalog, WIT's attorney sent Shingala a cease and desist letter. J. Shingala Dep. 205:10-17. In this second printing, Shingala affirmatively removed WIT's identifying information and substituted in Capital Core's name and removed all of WIT's copyright notices and printed copies of WIT's catalog. M. Hester Decl. ¶ 58, ECF No. 177-1. This evidence all indicates that WIT did not intend for Capital Core defendants to copy WIT's photographs without compensation. The Court denies Defendants' motion for summary judgment on the issue of an implied license.

Having resolved all disputed issues on liability in favor of Plaintiff, the Court grants Plaintiff judgment on its copyright infringement claim against Shingala, Capital Core, Inc., Capital Core Dayton, LLC, Capital Core Pittsburgh, LLC.

### e. Damages from Capital Core Defendants

Pursuant to 17 U.S.C. § 504, Capital Core Defendants are liable for either:

(1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or
(2) statutory damages, as provided by subsection (c).

17 U.S.C. § 504(a).

Plaintiff seeks actual damages and profits from the Capital Core Defendants. "A plaintiff seeking actual damages must prove the existence of a causal connection between the alleged infringement and some loss of anticipated revenue." *Thoroughbred Software Intern., Inc. v. Dice Corp.*, 488 F.3d 352, 358 (6th Cir. 2007) (internal citations omitted). Actual damages in this case would be the amount Defendants would have had to pay Plaintiff to use the photographs in the manner Defendants used them. Plaintiff seeks actual damages in the form of the cost Capital Core, Inc., Capital Core Dayton, and Capital Core Pittsburgh would have paid to license the photographs. Plaintiff asserts each entity would have been required to pay $20,800 to license all the photographs and therefore for the three entities the actual damage is $62,400. Defendant responds there is no evidence Defendant would have licensed the 104 transmission layouts which appear in the infringing catalogs for $200 a layout and that WIT only charged license fees when a catalog customer wanted to use the photographs but not WIT's numbering system and other customers could buy the generic printed catalog for $4.

There is a genuine dispute of material fact over whether the Capital Core Defendants would have been required to license the photographs or could have purchased generic printed copies for $4. In 2004, WIT sold thousands of copies of its print generic catalog for $4 apiece. M. Hester Decl. Ex. 5 PAGEID # 4792–

99, ECF No. 81-5.  However this version of the catalog only included photographs and part numbers, it did not have any part descriptions.  M. Hester Decl. ¶ 43, ECF No. 177-1.  In 2007, WIT created a generic catalog disc which included all the photographs, descriptions, links and text included in the WIT branded catalog.  *Id.* ¶ 46.  This is the catalog disc that Shingala printed.  Mike Hester's declaration states WIT sold paper and disc copies of its 2007 WIT branded catalog, *id.* ¶ 37, but there is no mention of sales of a printed version of this 2007 generic catalog disc.  Accordingly, it is unclear whether Capital Core Defendants could have purchased the same catalog that Shingala printed for $4 a piece.  This ambiguity creates a genuine dispute of material fact as to the actual damages WIT suffered and precludes judgment on this matter for either side.[20]

Plaintiff also seeks Defendants' profits for the three years Capital Core Defendants distributed the catalogs.

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profits attributable to factors other than the copyrighted work.

---

[20] Because there is a genuine dispute of  fact  regarding the issue of actual damages, the Court declines to consider whether Plaintiff has presented evidence  which proves it would have charged each Defendant $200 per transmission layout and that there were 104 layouts in the 2007 infringing catalog.

17 U.S.C. § 504(b). Plaintiff asserts Defendants' gross revenue for sales to the catalog recipients Defendants disclosed for the years 2008, 2009, and 2010 is $6,225,552.71. *See* Dan Gentry Decl., ECF No. 177-7.

"On its face § 504(b), does not differentiate between 'direct profits'— those that are generated by selling an infringing product—and 'indirect profits'— revenue that has a more attenuated nexus to the infringement." *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002). However, several courts have held that when indirect profits are at issue, a copyright holder must establish the initial causal link before a defendant is required to demonstrate the apportionment of the profits. *See*, *e.g.*, *id.*; *Univ. of Colo. Found. Inc. v. Am. Cyanamid Co.*, 196 F.3d 1366, 1375 (Fed. Cir. 1999); 4 Nimmer on Copyright § 14.03[B][2][a] (2012). Because Plaintiff seeks profits from Capital Core Defendants' sale of transmission parts, rather than the sale of the catalog or the photographs, Plaintiff must show some connection between the infringement and the profits before the burden shifts to Defendants.

Plaintiff asserts Shingala's testimony establishes the connection between the infringement of WIT's photographs and Defendant Capital Core's profits. However, Shingala states only that he is not sure why his business grew, but that he thinks Capital Core's market share went up because he began to learn the business and customers realized Capital Core was a stable business. Shingala Dep. 226–27, ECF No. 93. Plaintiff cannot use Defendant's lack of definitive explanation for its growth as evidence of causation between the photographs and

the profits. Similarly, Plaintiff's unsupported argument that the photographs made Capital Core Defendants look like a substantial enterprise or supported Defendants' claim to be the best in the business cannot demonstrate causation between the photographs and the profits.

The relationship between WIT's photographs and Capital Core Defendants' profits are speculative at best and therefore do not create a genuine dispute of fact. *See Mackie*, 296 F.3d at 916. The Court grants Capital Core Defendants summary judgment on the issue of profit damages. This holding does not preclude Plaintiff from pursuing actual or statutory damages.

### f. Greyden's Liability and Damages

Plaintiff also moves for summary judgment on its copyright claim against Greyden.[21] Greyden argues it is not liable for copyright infringement because the claim is directed at the catalog as a whole, which does not have a copyright registration and was authored by Missy Allen; the photographs are not original enough to be copyrighted; Plaintiff granted Capital Core Defendants a non-exclusive license; there is no such thing as aiding and abetting liability in copyright law; and the photographs did not contain proper copyright notices and, therefore, Greyden was an innocent infringer.

---

[21] Defendant J.K. Publishing d.b.a. Greyden moved to dismiss the third amended complaint on March 15, 2012, ECF No. 166. Plaintiff moves to strike this motion as untimely, ECF No. 173. Plaintiff's motion to strike is denied as motions to strike are only properly addressed towards pleadings. Fed. R. Civ. P. 12(f). Defendant J.K. Publishing's motion to dismiss, however, is substantially covered by its later response to Plaintiff's motion for summary judgment. Accordingly, Greyden's motion to dismiss is moot.

The first three arguments have been extensively addressed above and hold no merit. Plaintiff owned the copyrighted photographs and properly registered them. Greyden copied those photographs by printing the infringing catalogs for Shingala. Shingala Dep. Ex. 34, ECF No. 83-20. In addition, Plaintiffs seek and have proven direct liability, not aider and abetter liability. *See* 17 U.S.C. § 501(a) ("Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright . . . ."); 17 U.S.C. § 106 (copyright owner's exclusive rights include the right to reproduce a copyrighted work in copies).

Finally, innocent intent is not a defense to copyright infringement liability.[22] 4 Nimmer on Copyright § 13.08[B][1] (2012). Rather, if an infringer was unaware that it was violating a copyright, a court may decrease the damages owed.

> In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200.

17 U.S.C. § 504(c)(2). Accordingly, the Court grants Plaintiff summary judgment against Greyden on its claim of copyright infringement.

---

[22] Greyden argues that if any photographs were taken prior to 1988, WIT's failure to conform to the statutory copyright notice formalities would put the photographs in the public domain. All evidence in this case demonstrates that the photographs were taken after the year 2000 when WIT was founded.

Greden also cites to 17 U.S.C. § 405(b) which deals exclusively with copies publicly distributed prior to the Berne Convention Implementation Act of 1988 and is therefore irrelevant to this case.

Plaintiff seeks only actual or statutory damages against Greyden, rather than Greyden's profits, but does not provide evidence or argumentation as to the actual or statutory damages Greyden owes. Greyden itself has not moved for summary judgment on the issue of innocent infringement, but merely raises it as a defense to Plaintiff's motion. Accordingly, the Court declines to consider further whether Greyden was an innocent infringer for purposes of a damages calculation and the issue of Greyden's damages remains undecided.

## B. Unfair Trade Practices, Unfair Competition, and Unjust Enrichment

In Counts Two and Three of the Third Amended Complaint, Plaintiff avers the Defendants engaged in unfair trade practices in violation of 15 U.S.C. § 1117(a) and unfair competition in violation of Ohio Revised Code § 4165.01 by distributing the catalog with the symbol "© WIT" on every page. Plaintiff states that it intends to abandon these claims. Therefore, the Court grants Defendants summary judgment as to Counts Two and Three.

In Count Four, Plaintiff seeks damages under the theory of unjust enrichment. Capital Core Defendants argues this claim is preempted by the Copyright Act and, in any event, the evidence does not support Plaintiff's claim.

Plaintiff alleges it conferred a benefit on the Capital Core Defendants by sending the catalogs on disc and that the circumstances constitute an implied promise to pay. Plaintiff describes the circumstances as Defendants' knowledge that WIT licensed the catalog and photographs and expected to be paid a

licensing fee if Defendants reproduced the catalog and Defendants' affirmative request that Plaintiff WIT send an electronic copy of the catalog.

Although there are two ways of interpreting this claim, each interpretation leads to judgment for Defendants. To the extent the unjust enrichment claim is based on copying, it is preempted by the Copyright Act. *Tastefully Simple, Inc. v. Two Sisters Gourmet, L.L.C.*, 134 F. App'x 1, 6 n.3 (6th Cir. 2005). To the extent the claim is based solely on the benefit WIT conferred by sending the catalog on disc, the evidence does not support the claim. Plaintiff sent Capital Core a no-charge invoice for the disc containing WIT's catalog. Dep. Shingala Ex. K, ECF No. 88-11 (2007 invoice); Defs. Reply Ex. E, ECF No. 132-4 (2009 invoice). Plaintiff cannot prove there was an implied promise to pay for the discs when they made an explicit statement that no payment for the discs was due. Accordingly, the Court grants Defendants summary judgment on Plaintiff's unjust enrichment claim.

## C. Defendants' Counterclaims

Plaintiff moves for summary judgment on Defendants' counterclaims. In Counterclaim One, Defendants seek a declaratory judgment that the copyrights at issue are invalid because WIT allegedly made false and misleading statements to the Copyright Office by, among other deficiencies, failing to identify the digital alteration of the work, incorrectly designating the work as "work for hire," and failing to identify Combs and Allen as the authors. Counterclaim Two seeks declaratory judgment that Defendants did not infringe Plaintiff's copyrights.

Counterclaim Four seeks a declaratory judgment of implied license. As the Court has found Plaintiff's copyright registration for the photographs was valid; Plaintiff did not license Defendants to use the photographs; and Defendants did infringe Plaintiff's copyright, the Court grants Plaintiff summary judgment on Capital Core Defendants' Counterclaims One, Two and Four.

Counterclaim Three seeks damages for WIT's misuse of copyright. Plaintiff argues copyright misuse is an affirmative defense and cannot support a claim for damages. Defendant responds that it is a proper counterclaim. The Northern District of Ohio has held that copyright misuse may be asserted as an affirmative claim in a declaratory judgment action. *Midwest Tape, LL v. Recorded Books, LLC*, No. 3:09–cv–2176, 2010 WL 1258101, at *1 (N.D. Ohio 2010). Defendants' Counterclaim Three, however, does not seek a declaratory judgment that Plaintiff misused its copyright. Rather, Defendants ask that Plaintiff's copyrights be invalidated and Defendants be able to recover any damages and/or appropriate attorneys' fees and costs. Amend. Answer ¶ 212, ECF No. 161.

Even if it were a cognizable claim, Defendants have not presented evidence which demonstrates a genuine dispute of material fact. To establish copyright misuse, a defendant must establish either that the plaintiff violated the antitrust laws or that the plaintiff illegally extended its monopoly beyond the scope of the copyright or violated the public policies underlying the copyright laws. *Microsoft Corp. v. Compusource Distributors, Inc.*, 115 F. Supp. 2d 800,

810 (E.D. Mich. 2000). Defendants argue Plaintiff attempted to extend its monopoly beyond the scope of its copyright because it claimed a copyright in the catalog instead of just the photographs and does not charge licensing fees for the reproduction of its catalogs or individual photographs. Although Plaintiff did seem to claim a copyright in its catalog it also claimed a copyright in the photographs. There is no evidence Plaintiff has pursued actions against other companies based solely on a claim of copyright in the catalog. In addition, there is evidence that Plaintiff charged for copies of its catalog and to license its photographs. Therefore, Defendants' arguments are without merit and the Court grants Plaintiff summary judgment on Defendant's counterclaim for misuse of copyright.

In Counterclaim Five, Defendants seek damages for unfair competition. Counterclaim Six seeks damages for Deceptive Trade Practices under Ohio Revised Code Chapter 4165. Plaintiff argues these claims are preempted by the Copyright Statute, there are no facts to support them, and Defendants have presented no evidence of damages.

Assuming Counterclaims Five and Six are not preempted, Defendants have presented no evidence that Plaintiff engaged in such behavior. Ohio common law unfair competition generally consists of representations by one person for the purpose of deceiving the public that his goods are those of another but also extends to commercial practices such as malicious litigation, circulation of false rumors, or publication of statements designed to harm the business of

another. *Curcio Webb LLC v. Nat'l Benefits Programs Agency, Inc.*, 367 F. Supp. 2d 1191, 1213 (S.D. Ohio 2005). The Ohio Deceptive Trade Practices Act prohibits conduct designed to disparage the services or business of another by false representations of fact. O.R.C. § 4165.02(A)(10). Beyond the arguments the Court has already dispensed with, Defendants claims boil down to the allegation that Plaintiff falsely lead customers to believe Defendants committed infringement. This Court has held that Defendants did infringe Plaintiff's copyrights. Accordingly, Plaintiff did not act falsely and Plaintiff's motion for summary judgment is granted as to Defendant's Counterclaims Five and Six.

## IV. CONCLUSION

For the above reasons, the Court **GRANTS IN PART AND DENIES IN PART** both sides' motions for summary judgment, ECF No. 177 & 179. The Court grants Plaintiff summary judgment on the issue of copyright infringement liability as to all Defendants; denies both sides summary judgment on the issue of actual damages; and grants Capital Core Defendants summary judgment on claims stemming from copying the catalog, the issue of profit damages, and Plaintiff's claims for unfair trade practices, unfair competition, and unjust enrichment. The Court also grants Plaintiff summary judgment on all of Defendants' counterclaims.

Finally, the Court **DENIES** Defendant's motion to strike, ECF No. 173, but finds Defendant Greyden's motion to dismiss, ECF No. 166, **MOOT**.

**IT IS SO ORDERED.**

_Michael H. Watson_
**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**